UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 24-cr-8 (RC) |
| v. : | |
| : | |
| DAVID MITCHELL BATES, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. David Mitchell Bates has pleaded guilty to two second degree misdemeanors: a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Bates to 30 days' confinement on Count One and 36 months' probation and 60 hours of community service on Count Two. The government also requests that this Court, consistent with the plea agreement, impose $500 in restitution.

**I.    Introduction**

David Mitchell Bates, currently age 37 and employed as a chef in West Virginia, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the

1

peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

On May 23, 2024, Bates pleaded guilty to violations of 40 U.S.C. §§ 5104(E)(2)(D) and (G). The government's recommendation is supported by Bates' (1) joining in aggressive chants with other rioters outside the Capitol building, including "it's our fucking Capitol", "we're coming in", and "storm the doors"; (2) entry into the Capitol building after observing television news coverage showing rioters breaching the fencing around the building; (3) observing, shortly before entering the Capitol, uniformed police officers blocking rioters' access to a window near the Senate Wing Door and other rioters damaging that door and its windows; (4) taking video of the riot on his mobile telephone;  (5) purposeful destruction of evidence after the events of January 6, 2021, via the deletion of messaging chats and other information from his mobile telephone; (6) extensive criminal record; and (7) coordination of his criminal conduct with others.

The Court must also consider that Bates' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Bates'

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

crimes support a sentence of 30 days' confinement, 36 months' probation, 60 hours of community service, and restitution of $500 across the two counts in this case.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the previously provided general summary of the attack on the U.S. Capitol. *See* ECF No. 32.

*Bates' Role in the January 6, 2021 Attack on the Capitol*

Bates joined the West Virginia Chapter of the Proud Boys in November 2020 in the aftermath of the 2020 Presidential Election. After joining the organization, Bates participated in multiple events with the West Virginia Chapter, including traveling from Falling Water, WV to Washington, DC on December 12, 2020, where he photographed himself participating in a Proud Boys demonstration protesting the results of the 2020 Presidential Election on the evening of December 12 and into the morning of December 13. *See* Images 1 and 2.



*Images 1 and 2: Photos of Bates on December 12 (L) and 13 (R), 2020 in Washington, DC*

3

On January 5, 2021, Bates traveled to Washington, DC from Falling Water, WV, where he met up with fellow members of the West Virginia Chapter of the Proud Boys. The following day, on January 6, 2021, Bates and his fellow chapter members met other Proud Boys members from various chapters near the Washington Monument. *See* ECF No. 32 at ¶¶ 8, 9. Rather than wearing Proud Boys colors (as seen in Images 1 and 2, above), Bates and other Proud Boys followed the commands of leadership and dressed in plain clothes. Bates is depicted below in Image 3 near the Washington Monument, wearing a woodland camouflage patterned top with the logo of the Washington Capitals professional hockey team, a black beanie hat with blue bottom trim, and grey pants.



*Image 3: Photo of Bates near the Washington Monument*

Bates and the other Proud Boys marched from the Washington Monument to the Capitol. They marched around the west, north, and east sides of the U.S. Capitol prior to the breach. During the march, Bates could see both fencing and signage indicating that the restricted area around the

U.S. Capitol was closed to the public. *See* ECF No. 32 at ¶¶ 10-11. Bates is depicted in Image 4 below marching on the west side of the U.S. Capitol, with fencing and signage visible in the background.



*Image 4: Photo of Bates marching on west side of U.S. Capitol*

After the Proud Boys march returned to the west side of the U.S. Capitol and paused on Constitution Avenue NW between 1st and 3rd Streets NW, Bates left the march to check into a new hotel. While at the hotel, Bates observed television news coverage of rioters breaching the fences surrounding the restricted area of the U.S. Capitol and decided to return to U.S. Capitol Grounds. *Id*. at ¶ 12.

Bates entered the restricted area and made his way to the Upper West Terrace. *Id*. at ¶ 13. While on the Upper West Terrace, Bates began to record events on the terrace using his cell phone. As documented in Exhibits 1 and 2, Bates joined in various chants being uttered by other rioters and voiced his support for rioters entering the building by shouting, at various moments, "it's our

fucking Capitol," we're coming in," and "storm the doors!" *Id.* at 14. At the time he was making these recordings, Bates observed both uniformed police officers blocking rioters' access to a window near the Senate Wing Door around 2:28 p.m. and other rioters actively damaging the door and windows of the Senate Wing Door around 2:30 p.m. S*ee* Images 5 and 6.

 

*Images 5 and 6: Screenshots from Exhibits 1 (L; timestamp 00:35) and 2 (R; timestamp 00:30)*

After filming events on the Upper West Terrace near the Senate Wing Door, Bates entered the Brumidi Corridor of the U.S. Capitol via the Parliamentarian Door at approximately 2:45 PM. ECF No. 32 at ¶ 15. While inside the Brumidi Corridor, Bates again used his phone to capture his surroundings while joining in chants being uttered by the crowd, thrusting his arm into the air

6

repeatedly, and pointing in the direction of uniformed police officers located further down the Brumidi Hallway. *Id*. at ¶ 16; *see also* Exhibit 3. Bates retraced his steps and exited the U.S. Capitol via the Parliamentarian Door at approximately 2:49 PM. ECF No. 32 at ¶ 17.

After exiting the Capitol building, Bates reunited with other Proud Boys members. Bates remained inside the restricted area until after 4:00 PM. *Id*. at ¶ 18.

Within days of January 6, Bates received guidance from the President of the West Virginia Chapter of the Proud Boys instructing him to delete messages associated with the Proud Boys and the events of January 6, 2021. *Id*. at ¶ 19. Bates deleted the messages and other materials, including location data, from his cellular phone and Google accounts. *Id.*

*Bates' Post-arrest Interview with the FBI*

After being arrested on December 13, 2023, Bates gave a voluntary post-arrest interview to the FBI. During the interview, he admitted traveling to Washington to attend then-President Trump's rally. Bates claimed that he traveled to Washington, D.C. in order to prevent any disruption of the rally by Antifa protestors. Bates also acknowledged marching with other Proud Boys around the U.S Capitol prior to the breach of the restricted area and admitted to returning to the U.S. Capitol after seeing television coverage of the initial breaches of the restricted area by rioters. Bates initially claimed that he could not recall entering the U.S. Capitol Building on January 6, 2021, due to having consumed as many as 18 beers, as well as moonshine and marijuana, throughout the day, but subsequently identified himself in multiple photos depicting him inside of the U.S. Capitol Building.

*The Charges and Plea Agreement*

On January 3, 2024, the United States charged Bates via a four-count Information with violating 18 U.S.C. § 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104 (e)(2)(D) and (e)(2)(G). On May

7

23, 2024, pursuant to a plea agreement, Bates pleaded guilty to Counts Three and Four of the Information, charging him with violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G). In the plea agreement, Bates agreed to pay $500 in restitution to the Architect of the Capitol.

### III. Statutory Penalties

Bates now faces a sentencing for violations of 40 U.S.C. § 5104 (e)(2)(D) and (e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, for each count Bates faces up to six months of imprisonment and a fine of up to $5,000. Bates must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply to them. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days' confinement, 36 months' probation, 60 hours of community service, and restitution of $500 across the two counts in this case.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Bates' participation in that attack to fashion a just sentence, this Court should consider various

8

aggravating and mitigating factors. Notably, for a misdemeanor defendant like Bates, the absence of violent or destructive acts is not a mitigating factor, as had Bates engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Bates' case is his coordination of criminal activity with others, and the knowledge and intent that can be inferred from his participation in multiple election related protests as part of the group. Following the 2020 Presidential Election, Bates twice traveled to Washington, D.C. to participate in election-related protests with the Proud Boys organization. Bates first joined the Proud Boys on December 12 and 13, 2020, and then later returned with the Proud Boys to participate in January 6. On December 12, 2020, Bates was present in DC during an evening that resulted in substantial violence between Proud Boys and counter-protestors, the arrest of nearly three dozen people, and multiple stabbings.[2] Well aware of the violence that had resulted from the December 2020 Proud Boy demonstration in the District of Columbia, Bates nonetheless chose to voluntarily gather with other Proud Boys on January 6, 2021. Rather than remain at the rally at the Ellipse, Bates followed his gang to the Capitol, and after unlawfully entering the Capitol by himself, Bates reunited with other Proud Boys and remained unlawfully on Capitol grounds for over an hour.

Bates' participation in January 6 with members of the Proud Boys also relates to another significant factor the Court must consider: Bates' destruction of incriminating evidence at the direction of senior leadership. As discussed above, after leaving Capitol Grounds, Bates was instructed by the president of his chapter to delete messages and chats associated with the Proud

---

[2] Peter Hermann, Marissa J. Lang, and Clarence Williams, *Pro-Trump rally descends into chaos as Proud Boys roam D.C. looking to fight,* WASHINGTON POST (Dec. 13, 2020), https://www.washingtonpost.com/local/public-safety/proud-boys-protest-stabbing-arrest/2020/12/13/98c0f740-3d3f-11eb-8db8-395dedaaa036_story.html

Boys and the events of January 6, 2021.³ Bates subsequently complied with these instructions, deleting the chats, as well as location data and other materials, in an unsuccessful attempt to shield himself from future prosecution. Bates' destruction of evidence demonstrated his continued fidelity to the Proud Boys in the aftermath of the Capitol Insurrection, the absence of any immediate remorse for his conduct, and his own awareness of the seriousness of his actions and the possible consequences if he were to be identified. Accordingly, the nature and the circumstances of this offense establish that a period of incarceration is warranted.

### B. Bates' History and Characteristics

While the sentencing guidelines do not apply to Bates' instant convictions, his criminal history remains a relevant factor in determining an appropriate sentence. As set forth in the PSR, Bates' criminal history consists of:

1. A 2007 conviction for Second Degree Assault in Maryland, for which he received a sentence of 18 months' incarceration, execution of sentence suspended (ESS) as to 16 months, a fine, and one year of probation;

2. A 2007 conviction for Theft by Unlawful Taking – Movable Property in Pennsylvania, for which he received a sentence of 24 months' probation, later revoked in 2008 with a new sentence of 8 to 23 months' incarceration;

3. A 2009 conviction for Second Degree Assault in Maryland, for which he received a sentence of 6 months' incarceration, ESS as to all, and two years of probation;

---

³ The President of the West Virginia chapter pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1). The terms of his plea agreement included a two-point enhancement for "Obstruction" under U.S.S.G. §3C1.1 based on his deletion of photos and social media and direction to members of his chapter to delete their materials. *United States v. Jeffery Finley*, 21-cr-526 (TSC), ECF No. 48. Finley was sentenced to 75 days' incarceration. *Id*. at ECF No.51

4. A 2011 conviction for Driving Under the Influence in Maryland, for which he received a sentence of 11 months and 20 days' incarceration;

5. A 2013 conviction for Disorderly Intoxication in Maryland, for which he received a sentence of 90 days' incarceration;

6. A 2013 conviction for Driving Under the Influence in Maryland, for which he received a sentence of 1 year confinement, ESS as to all, a fine, and 2 years' probation;

7. A 2015 conviction for Driving with a Revoked License in Maryland, for which he received a sentence of 1 year incarceration, ESS as to all, a fine, and 2 years' probation;

8. A 2016 conviction for Disorderly Conduct and Simple Assault in Washington, D.C., for which he received a sentence of 30 days' incarceration, ESS as to all, and 9 months' probation;

9. A 2017 conviction for Driving While Impaired in Maryland, for which he received a sentence of 3 years' incarceration, ESS as to all, and 2 years' probation;

10. A 2018 conviction for Illegal Possession of a Firearm in Maryland, for which he received a sentence of 5 years' incarceration, ESS as to all, and 3 years' probation; and,

11. A 2018 conviction for Unsworn Falsification to Authorities in Pennsylvania, for which he received a sentence of 12 months' probation and a fine.

ECF No. 35 at 8-17. Notably, at the time of his criminal conduct on January 6, 2021, Bates was still serving his sentence of probation for his 2018 firearm conviction in Maryland, which did not expire until May 2021. *Id.* at 16.

Bates is married with one dependent child, and his wife depends upon Bates' income in order to afford medication for a medical condition. *Id*. at 18. However, Bates's wife is also currently employed, and Bates has recently acquired health insurance coverage. *Id*. at 18-19. Bates

11

has worked since 2023 as a chef at a restaurant in Shepherdstown, West Virginia. *Id.* at 21. Bates has been compliant with his conditions of pre-trial release since his arrest in December 2023. *Id.* at 4. Bates owns a home in Falling Water, West Virginia, but reported that he is $13,000.00 behind on his mortgage, and that the home is under foreclosure. *Id.* at 23. Bates was severely injured by a falling tree in October 2019, and needed extensive treatment and rehabilitation for his injuries, some of which continue to cause him pain in the present day. *Id.* at 19. The government notes that Bates' injuries from 2019, while undoubtedly serious and long-lasting, did not prevent him from participating in a violent riot on January 6, 2021.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As we approach what promises to be another fiercely contested presidential election in November 2024, the gravity of the offenses committed on January 6, 2021 demands significant sentences in order to properly establish deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.") There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily against a probationary sentence. First, as discussed above, Bates' history of prior arrests and convictions reveals a clear pattern of disrespect for the law and disregard for the consequences of breaking it. *See* Section IX(B) *supra.* As documented in his criminal history, Bates has benefited during numerous previous prosecutions from the opportunity afforded by a

13

suspended sentence and a term of probation, to include for his most recent felony conviction in 2018. However, those relatively forgiving experiences with the criminal justice system, along with his limited prior periods of incarceration, clearly did not deter Bates from committing crimes on January 6. Well aware that he was on probation at the time, he voluntarily chose to return to Capitol Grounds following the initial breaches of the restricted perimeter and knowingly chose to enter the U.S. Capitol as part of the crowd of rioters. As a result, the Court must impose a sentence that succeeds where Bates' past criminal sentences have arguably failed by making clear the consequences of his actions and deterring future criminal conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assaults on police officers.[4] This Court must sentence Bates based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Bates has pleaded guilty to Counts Three and Four of the Information, charging him with Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(E)(2)(D), and Parading, Demonstrating, or Picketing in any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(E)(2)(D). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a),

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012); *see United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present in Bates' case, Courts in this district have previously imposed sentences of home detention or incarceration for defendants with similar conduct, criminal history, and prior coordination with other rioters. In *United States v. Robert Chapman*, 21-cr-00676 (RC), a defendant who pled guilty to a single count under 40 U.S.C. § 5104(E)(2)(G) and had criminal history that included recent convictions for DUI and possession of a knife was sentenced by this Court to 3 months of home detention and 18 months' probation. Similarly, in *United States v. Francis Connor*, 21-cr-586 (RC), a defendant who pled guilty to a single count under 30 U.S.C. § 5104(E)(2)(G) and engaged in coordination on social media with other rioters prior to January 6 was sentenced by this Court to 3 months' home detention, 12 months' probation, and a fine. In *United States v. Edward Hemenway*, 21-cr-49 (TSC), a defendant who pled to a single count of violating 40 U.S.C. § 5104(E)(2)(G) and had prior convictions for sexual battery and criminal confinement was sentenced by Judge Chutkan to 30 days' incarceration. Similarly, in *United States v. David Mish*, 21-cr-112 (CJN), a defendant who pled guilty to a single count of 40 U.S.C. § 5104(E)(2)(G) and had a lengthy non-violent criminal history was sentenced by Judge Nichols to

30 days' incarceration. Finally, In *United States v. Nicholas Hendrix*, 21-cr-426 (CKK), a defendant who pled guilty to a single count of violating 40 U.S.C. § 5104(E)(2)(G) and was only inside the Capitol for approximately 90 seconds was sentenced by Judge Kollar-Kotelly to 30 days' incarceration. Notably, Hendrix, unlike Mr, Bates, was a military veteran, had only a single prior conviction for possession of controlled substance, and did not delete or otherwise destroy evidence of his conduct on January 6.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Bates must pay $500 in restitution, which reflects in part the role Bates played in the riot on January 6.[6] ECF No. 31 at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Bates' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* ECF No. 35 at ¶ 100.

## VI. Fine

Bates' convictions for violations of 40 U.S.C. §§ 5104(E)(2)(D) and (G) subject him to a statutory maximum fine of $5,000.00 for Count Three and Count Four, respectively. *See* 18 U.S.C.

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

§ 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Bates' financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine.

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Bates to a sentence of 30 days' confinement on Count One, 36 months' probation and 60 hours of community service on Count Two, and $500.00 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future criminality by imposing restrictions on Bates' liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crimes.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   s/ *Samuel White*

Assistant United States Attorney
NC Bar # 44908
601 D Street NW
Washington, DC 20530
202-431-4453
Samuel.white@usdoj.gov